[1] This is an action to recover for personal injuries and property damage sustained by plaintiff, George Pudiwitr, in an intersectional collision between the automobile which he was driving and an automobile owned and operated by defendant, Jack Soloman. Defendant filed a counterclaim for his own personal injuries and property damage.
[2] At a trial upon the facts without a jury, the court assessed damages in the sum of $650 in favor of plaintiff upon his cause of action, and also found in favor of plaintiff, and against defendant, upon the latter's counterclaim. Judgment was entered in accordance with the findings of the court; and following an unavailing motion for judgment, or, in the alternative, for a new trial, defendant gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for our review.
[3] Plaintiff counted in his petition upon three assignments of primary negligence coupled with an assignment of negligence *Page 564 
under the humanitarian doctrine. The charges of primary negligence were excessive speed; failure to slacken the speed of defendant's automobile or to swerve it in such a manner as to avoid colliding with plaintiff's automobile; and defendant's entry into the intersection when the electric signal was against him. The charge under the humanitarian doctrine was based upon defendant's failure to have stopped, slackened the speed of, or swerved his automobile after he saw or should have seen plaintiff in a position of imminent peril.
[4] Defendant's answer was a general denial of all of plaintiff's charges of negligence, coupled with the affirmative allegation that whatever injury and damage plaintiff had sustained had been due to his own contributing carelessness and negligence in operating his automobile at an excessive rate of speed; in entering the intersection when the electric signal was against him; in failing to keep a lookout ahead or laterally for other vehicles; in failing to have his automobile under such control that it could be readily stopped at the first appearance of danger; and in so turning, swerving, and driving his automobile as to cause it to collide with defendant's automobile, which had allegedly started across the intersection with the light in defendant's favor.
[5] The counterclaim was predicated upon an unchallenged plea of general negligence.
[6] The accident happened about 6:00 a. m. on September 12, 1947, at the intersection of Lindell and Union Boulevards, in the City of St. Louis. Lindell Boulevard runs east and west, while Union Boulevard runs north and south and terminates at its entrance into Forest Park on the south side of Lindell Boulevard. Both streets are wide thoroughfares much used for traffic, and what would otherwise be the corners of the intersection have been rounded out and extended so that a motorist going in either direction on either street actually enters the intersecting area before he is even with the curb line of the street which he is about to cross. There is a standard electric signal at the intersection with alternate red and green lights to control the movement of traffic on both streets.
[7] While it is agreed that the collision happened at the intersection of Lindell and Union Boulevards, the case presents the most unusual spectacle of the parties being in dispute as to which of them was on Lindell and which on Union, and also as to the respective directions in which they were traveling. Plaintiff bases his cause of action upon the theory that he was westbound on Lindell Boulevard and defendant southbound on Union, while defendant insists that it was he who was on Lindell traveling eastbound, and that plaintiff was southbound on Union Boulevard.
[8] Plaintiff was employed at the time of the accident by an industrial concern located at 1822 Cherry Street in Wellston, and was assigned to a shift that went of duty at 11:00 p. m. He was accustomed to eat his evening meal at a place referred to as Harris' Tavern, which is situated in the 6100 block of St. Louis Avenue, about four blocks from his place of employment. On the evening in question he had a tentative arrangement to meet one Dorothy Haynes at the tavern when he came off shift at his regular quitting time. Dorothy Haynes resided at 2411 North Vandeventer Avenue, and was a friend of the Harris family. She and plaintiff had previously discussed the prospect of a date, but this was the first occasion that they had actually gone out together.
[9] When plaintiff called to keep his appointment, he not only met Dorothy Haynes, but also one Eddie Frame and two unidentified young women, all of whom made up a party. Plaintiff was twenty-five years of age, and Dorothy Haynes twenty-four. They remained at the tavern until closing time, and then drove in plaintiff's automobile to a tavern near Wellston on the St. Charles Rock Road. Plaintiff himself spoke of it as located on Easton Avenue. They were drinking beer at both places, as they did at all the other taverns which they subsequently visited. From the second tavern they drove back to a barbecue stand at Kingshighway and Delmar Boulevard, where they had something to eat. They then drove once again to St. Louis Avenue, where Frame and the two unidentified young women left the party, after which *Page 565 
plaintiff and Dorothy Haynes "went riding around." Plaintiff thought they made an additional stop in South St. Louis, but was not at all certain about it. Although he had spent his entire life in St. Louis County, he professed to have but scant knowledge of the City of St. Louis, and testified that as far as he knew, "South St. Louis is East St. Louis, as a city". He then recalled driving over a bridge and making another stop at a tavern, which he imagined was in East St. Louis. Dorothy Haynes positively identified the place as in East St. Louis. Leaving this tavern, they returned across the river to St. Louis, and it was about 6:00 o'clock in the morning, or shortly before, when they had the collision with defendant's car.
[10] Plaintiff's hazy recollection of so many of the things that transpired would strongly indicate that he was under the influence of alcohol at the time of the accident, although both he and Dorothy Haynes testified to the contrary.
[11] According to plaintiff's personal testimony, he was driving westwardly on Lindell Boulevard approaching its intersection with Union Boulevard. He did not recall where he had entered upon Lindell Boulevard; and he explained that his immediate destination was his place of employment to which he was going to leave an order for some work that had to be done by 7:00 o'clock. Otherwise he might have been expected to have turned north on Vandeventer Avenue as the most direct course to the address where Dorothy Haynes resided.
[12] When he arrived at a point approximately 200 feet from Union Boulevard, he noticed that the red light was against him, and he slowed down to about 15 miles an hour while waiting for the light to change. The green light came on when he was 35 to 50 feet from Union Boulevard; and as the signal changed in his favor, he shifted to second gear and started across the intersection. His car was "just a little over the center" when the collision occurred, the front end of defendant's car striking the right side of his car just back of the door, and turning his car so that it was facing northwest after it came to a stop on the south side of Lindell Boulevard 10 to 15 feet beyond the point of impact. Asked by the court how far away defendant's car was when he first saw it, he replied that "it was a matter of a few feet", and that he "was not watching the other car". It was just getting light at the time of the accident, and the headlights of both cars were on. The necessity for lights is accounted for by the fact that daylight saving was in effect, so that the actual time of day was one hour earlier than that which the evidence disclosed.
[13] Dorothy Haynes testified that plaintiff had turned left into Lindell Boulevard off of Vandeventer Avenue, and that he was from 25 to 30 feet east of Union Boulevard when the green light came on in his favor. All she could say about plaintiff's speed at the time of the collision was that "he had just shifted into second, so he couldn't have been going fast". Plaintiff "was already started across Union a little ways" when she first saw defendant's automobile about 100 feet to the north on Union Boulevard. Whether plaintiff's car was then at the eastern edge of the intersecting area where the curved portion begins, or whether he was even with the curb line of Union Boulevard, she did not attempt to say. Asked about defendant's speed, she was "pretty sure he was going over thirty".
[14] Defendant's evidence presented an entirely different picture of the whole situation.
[15] Defendant resides at 1294 Amherst Place in the City of St. Louis, and operates a tavern at 2007 Market Street. He usually opens his tavern about 6:30 in the morning, and he was on his way to open up at the time the accident occurred.
[16] According to defendant's testimony, he had left his home that morning and had driven a short block west to Hodiamont Avenue, which he followed south to Delmar Boulevard, and from there over Des Peres to Lindell, where he turned east, intending to follow Lindell to its connection with Olive Street, and then down town to his place of business. In other words, he was positive in his testimony that he was *Page 566 
driving east on Lindell at the time of the accident, and not south on Union as plaintiff and Dorothy Haynes had testified.
[17] Defendant testified that he was driving at a speed of some 28 to 30 miles an hour about 5 or 6 feet out from the curb, and that when he approached within 30 feet of Union Boulevard he observed the traffic light turn green in his favor. He continued on at about the same speed, and when he was 10 or 15 feet inside the intersection he suddenly discovered plaintiff's southbound automobile 2 or 3 feet in front of his own car. His excuse for having failed to see plaintiff's automobile sooner was that after entering the intersection his attention had been focused upon the green light ahead of him. The front of his automobile struck the right side of plaintiff's car, and both cars were turned off their respective courses by the force of the impact. Plaintiff's car was facing north after the accident, while defendant's car was facing southeast. Both cars came to a stop about the center of Union Boulevard south of the south curb line of Lindell Boulevard, with plaintiff's car the farther south of the two.
[18] According to defendant, several police officers arrived on the scene 20 to 30 minutes after the accident had occurred. They took down his name, license number, and place of business, and likewise made inquiry of plaintiff, who corroborated defendant's testimony in such respect. When plaintiff was asked if the officers had wanted to know how the accident had happened, he replied that they had, and that he had told them that he "got there to the light and it changed to green and I went across the street and got hit". Asked if he had told the officers in what direction he was going, he answered that he believed he had. Dorothy Haynes confirmed plaintiff regarding what he had told the police, and denied having heard him tell them that he had been driving south on Union instead of west on Lindell.
[19] The significance of all this is that the police report, made out upon information supplied by Officers Cade and Pucci of the Eleventh District, revealed that upon the officers' arrival at the scene of the accident in response to a radio call, they were told by plaintiff "that a short time prior, as he was driving his Plymouth Sedan * * * South on the West side of Union, and when in the center of the intersection, his car was struck by a Buick Sedan owned and being operated east at the above location" by defendant.
[20] In other words, the police report, based upon information purportedly given the officers by plaintiff himself, fully corroborated defendant's version of the facts, while at the same time directly refuting the testimony of plaintiff and Dorothy Haynes that they were driving west on Lindell and defendant south on Union. The two officers had been subpoenaed as witnesses by defendant, but rather than have them subjected to the inconvenience of appearing in court, plaintiff's counsel had agreed that the police report might be read in evidence as the testimony that the officers would have given if actually present, but without plaintiff vouching for the truth of what the report contained.
[21] Immediately upon the close of all the evidence, the court, preparatory to rendering such judgment as it thought right upon the law and the evidence, made a statement to counsel of the grounds for its decision.
[22] The court specifically refused to determine the disputed question of which of the parties had driven through the red light. Neither did the court attempt any finding as to whether plaintiff had been westbound on Lindell and defendant southbound on Union, or defendant eastbound on Lindell and plaintiff southbound on Union. The court apparently concluded that it could decide the case without concerning itself too much about the parties' conflicting theories in regard to their respective positions.
[23] What most impressed the court was the fact that whatever may have been the respective courses that the parties had traveled, it was unquestionably defendant's car that had run into the side of plaintiff's car. The court expressed the view that each party should have seen the other before he did, and in effect held that each party had been guilty of negligence in such respect. Consequently the court concluded that the case should be ruled from the *Page 567 
humanitarian aspect of plaintiff's petition, and proceeding upon that theory the court found that plaintiff was entitled to a judgment based on the failure of defendant to have slackened his speed after he should, in the exercise of the highest degree of care, have seen plaintiff in a position of peril. The court did not purport to indicate at what point in the intersection plaintiff had entered a position of imminent peril, but merely held that defendant should have seen plaintiff's car before it was directly in front of his own, and that an early application of the brakes as soon as he saw that plaintiff's car was about to cross his path would have permitted plaintiff's car to complete the crossing without the necessity of a collision.
[24] Defendant makes three points which are to a great extent interrelated, the first, that the court erred in finding in plaintiff's favor under the humanitarian theory; the second, that the court erred in allowing plaintiff to recover on a theory opposed to his own evidence; and the third, that the court's finding was against the weight of the credible evidence.
[25] As for his first point, defendant insists that there was no basis for a recovery under the humanitarian doctrine because the evidence did not disclose when plaintiff came into a position of imminent peril, or whether it would have been possible for defendant thereafter to have avoided the accident by some affirmative act on his part. On the second point, defendant argues that since plaintiff failed to make a case on the basis of his own theory and evidence in support of it, he was not entitled to a judgment predicated on defendant's evidence, which contradicted the testimony of plaintiff and his witness, Dorothy Haynes. As regards the question of whether the court's finding was against the weight of the credible evidence, defendant calls our attention to the fact that while due regard must be had for the opportunity of the trial court to judge the credibility of the witnesses, this court none the less has the positive duty to weigh the evidence for itself and reach its own conclusions as to its weight and value.
[26] Plaintiff merely argues that for the purposes of our review, the court's finding is to be taken as nothing but a general finding of the issues in his favor; that the colloquy between court and counsel at the conclusion of the case during which the court announced the ground for its decision did not have the effect of a special finding; and that even if it should be assumed that plaintiff failed to make a case under the humanitarian theory, he was entitled to recover under his three assignments of primary negligence, all of which, in plaintiff's opinion, were supported by substantial evidence.
[27] It is true that the statement of the court announcing the ground for its decision was purely voluntary and not made at the request of either party. This does not mean, however, that it is not properly before us for our consideration in reaching our own result. The provision of the new code that the court trying facts without a jury shall dictate or prepare and file such a statement if requested by any party before final submission does not exclude the court's right to make such a statement of its own volition. Laws Mo. 1943, p. 388, sec. 114(b), Mo.R.S.A. § 847.114(b). Even under repealed Section 1103, R.S.Mo. 1939, Mo.R.S.A. § 1103, such a voluntary statement or memorandum, even though it could not be made the basis of an assignment of error, was nevertheless looked upon by the appellate court as an advisory opinion stating the court's reasons for the conclusion it had reached. Easton Food Center v. Beatrice Creamery Co., Mo.App., 119 S.W.2d 987; Lessner v. Monarch Ins. Co., 236 Mo.App. 161, 153 S.W.2d 129. The only thing was that whatever gratuitous finding the court may have made upon a disputed fact issue was not to be taken as a special verdict so as to be conclusive upon the appellate court if supported by substantial evidence. But under the new code the court's findings, even if requested, are not conclusive, but instead the appellate court is none the less required to review the case upon both the law and the evidence as in suits of an equitable nature. As a matter of fact, a special finding under the *Page 568 
new code serves no particular purpose except that in a situation where the evidence is conflicting and close, the appellate court may be expected to defer to it because of that court's regard for the superior opportunity of the trial court to judge the credibility of the witnesses.
[28] The truth of the matter is that the trial court in this instance actually made no special finding upon any controverted fact issue. Each party had admitted that he had not seen the other's car until momentarily before the accident, and there was no dispute about the fact that defendant's car struck plaintiff's car. As for the matters in controversy, the court not only avoided any specific decision as to which party was on which street, but in fact expressly refused to make a finding as to which of the parties had driven through a red light. The court concluded that irrespective of all those matters, plaintiff was in any event entitled to judgment upon the assumption that defendant, at the very latest, should have seen plaintiff's car when it was even with the curb line of whatever street it was about to cross, and that an earlier application of defendant's brakes as soon as he saw that plaintiff's car was going to cross his path would have permitted plaintiff's car to complete the crossing without a collision between the two vehicles.
[29] With all due respect for the views of the learned trial judge, we cannot bring ourselves to the conclusion that plaintiff is entitled to recover upon his cause of action.
[30] In the first place, plaintiff's own evidence, consisting of the testimony of himself and Dorothy Haynes, was so discredited as to be unworthy of belief. We say this largely upon the strength of the report of the two police officers, which disclosed that very shortly after the accident, plaintiff gave them information which fully corroborated defendant's account of the occurrence and directly refuted plaintiff's own testimony and that of Dorothy Haynes. Not only were the police officers wholly disinterested, but in investigating the accident and making out their report they were merely performing their official duties; and in the light of all the circumstances of the case there could be no reason whatever for allowing their statement to be overcome by plaintiff's subsequent contradictory evidence at the trial. Indeed it is significant that the trial court apparently did not decide the case upon the basis of plaintiff's evidence, but would rather seem (though making no specific finding to that effect) to have accepted defendant's testimony, and then to have held defendant liable upon the theory that since his car admittedly struck plaintiff's car towards the rear, there must necessarily have been some undisclosed point at which defendant had had the last clear chance to avoid the accident.
[31] Disbelieving plaintiff's evidence, it would be enough to dispose of the case that plaintiff failed to sustain his burden of proof. Furthermore it is fundamental that a party may not be allowed to recover upon the strength of his adversary's evidence which contradicts his own theory of the case. Steuernagel v. St. Louis Public Service Co., 357 Mo. 904, 211 S.W.2d 696; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S.W.2d 600.
[32] But apart from all this, the conceded facts upon which the lower court relied would not in any event be sufficient to support a recovery under the humanitarian doctrine. Even if it should be assumed that defendant, at the very latest, could have seen plaintiff's car when it was even with the curb line of whatever street it was about to cross, there is no showing that plaintiff's peril at that moment was certain, immediate, and impending, without which defendant could not be held liable under the humanitarian doctrine for having failed to take appropriate steps to avert a collision. Blaser v. Coleman, Mo.Sup.,213 S.W.2d 420. Nor are there enough facts in the case from which it can be found at what time plaintiff entered a position of peril, but instead that whole question is left to speculation and conjecture. At the very most, the mere fact that defendant's car struck plaintiff's car near the rear end could only convict defendant of primary negligence, as to which plaintiff's own contributory negligence would be a complete defense. We do thoroughly agree with the lower court that each party was *Page 569 
guilty of negligence directly contributing to cause the accident in having failed to see the other party's car before he did. This conclusion would of course bar defendant's recovery upon his counterclaim.
[33] It follows that the judgment rendered by the circuit court should be reversed in so far as it allowed plaintiff a recovery upon his cause of action, and affirmed in so far as it denied defendant a recovery upon his counterclaim. The Commissioner so recommends.